Filed 10/12/22  In re A.F. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.F. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.F. et al., <br><br> Defendants and Appellants. | E078981 <br><br> (Super.Ct.Nos. J281163 & J281164) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant, A.F.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant, C.H.

1

Tom Bunton, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

A juvenile court terminated the parental rights of defendants and appellants A.F. (father) and C.H. (mother) as to their children, A.F., Jr., and J.F. (the children).[1] Father and mother (the parents) have filed separate briefs on appeal and join in each other's arguments. Father contends the juvenile court abused its discretion and denied him due process by not allowing him to testify at the Welfare and Institutions Code[2] section 366.26 hearing. Mother argues the court abused its discretion by not granting her request for a short continuance of the section 366.26 hearing. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On May 29, 2019, San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the children. J.F. was six years old at the time, and A.F., Jr., was two.[3] The petition alleged that the children came within section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). It included allegations that mother had an untreated mental illness, the parents

_____

[1] Some parts of the record refer to father as A.F., Jr., and the child, A.F., as A.F. III. In order to avoid confusion, this opinion will refer to the child as A.F., Jr.

[2] All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

[3] The children's half-sibling, D.F., was also included in the petition, but he is not a subject of this appeal.

2

engaged in domestic violence, father had substance abuse issues, and A.F., Jr., was previously adjudged a dependent of the court, and father's reunification services were terminated.

The social worker filed a detention report and stated that CFS received an immediate response referral after mother self-reported to law enforcement that she had been physically and emotionally abusing the children.

The court held a detention hearing on May 30, 2019, and detained the children in foster care.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on June 17, 2019, and recommended that the court find the children come within section 300, subdivisions (b) and (g), declare them dependents, and provide reunification services to mother, but not father.

The social worker interviewed mother, who said she was diagnosed with bipolar disorder and schizophrenia when she was a teenager. Mother said she was supposed to see a psychiatrist every three months for medication monitoring; however, she had not been consistent with her treatment for the last six months. She said she felt like her medication was not working, and she went to the police station for help. She stated that father was rarely at the home and did not help.

The social worker interviewed the two older children, J.F. and D.F., at school on June 12, 2019. The social worker started out talking to them together; however, D.F. became upset with J.F., pushed her against the wall, and then hit her arm. So, the social

3

worker separated them. D.F. and J.F. each reported that they used to live with the parents, and the parents yelled at each other. J.F. said that father used to smack mother in the face.

The social worker reported there was a prior dependency case with the Los Angeles County Department of Children and Family Services on March 30, 2016, with regard to D.F. and J.F. The parents were provided with reunification services, but father's services were terminated for failure to comply. Mother completed her services, and jurisdiction was terminated on April 26, 2018.

At a hearing on July 19, 2019, the court sustained the petition and continued the disposition hearing to allow CFS to complete ICWA noticing. The court also set a six-month review hearing.

On August 9, 2019, the social worker filed a memorandum with additional information to the court (CFS 6.7) and reported that the three children were moved to different placements. D.F. was moved to his paternal grandparents' home, and A.F., Jr., and J.F. were moved to a foster home. The social worker changed her recommendation and recommended reunification services be provided to father, as well as mother.

At the disposition hearing on August 9, 2019, the court found father to be the presumed father of the children, declared the children dependents, removed them from the parents' custody, and ordered reunification services for the parents. The court subsequently found that ICWA did not apply.

*Six-month Status Review*

On February 7, 2020, the social worker filed a six-month status review report recommending that services be continued, as the parents were actively engaged. The social worker reported that during this reporting period they had maintained regular contact with the children through weekly visitations. The social worker filed an addendum report on February 27, 2020, and reported that mother visited twice a week and managed to attend the majority of her visits. Father had visits twice a week, and the social worker noted that he did not engage fully with the children during visits, and he often left early.

On February 28, 2020, the social worker filed another CFS 6.7 memorandum and reported that mother's supervised visits were generally held at the CFS office in Rancho Cucamonga. Both parents reportedly would provide the children with too much food and juice, resulting in A.F., Jr., throwing up. The children threw tantrums during visits and hit both father and mother when they did not get their way. Father ended a recent visit early due to not being able to handle the children's behavior.

The court held a contested six-month review hearing on March 5, 2020, and father requested to testify. He testified that he was participating in his case plan, but said, "I'm fighting for my kids and I shouldn't even have to do that." He said he did not think it was fair since he did not really do anything wrong. When asked about the social worker's report that he had difficulty handling the children's behavior during visits, father said their behavior was fine. He conceded that he would cut one of the visits every week short because he had to leave for work and that he would cut visits short when his

5

daughter acted up.  Father asked the court to have unsupervised visits outside of the CFS office.

The social worker also testified.  She said she got the information about father having issues managing the children's behavior at visits from their care provider, who received the information from the visitation supervisor.  The social worker further testified that she did not believe it would be appropriate for father to start having unsupervised visits due to the children's behavior and the issue with him feeding them too much.

Father's counsel asked the court to consider returning the children to father, or, if it continued father's services, unsupervised visits.  The court denied father's request for return of the children and stated it was obvious from what it observed on the stand that father had not benefitted from his services and that he took no responsibility for why the children were in a dependency case.  It then gave CFS authority to liberalize mother's visits to weekends and overnights, but any unsupervised visits with father had to be by approval packet.  The court set the matter for a 12-month review hearing.

*Twelve-month Status Review*

The social worker filed a status review report on July 15, 2020, recommending that the court continue the parents' reunification services.  The social worker reported that the children had been in their current foster home since July 24, 2019.  Their half-sibling, D.F., had been in his placement with his paternal grandmother since July 19, 2019.  The three children appeared to be stable and had adjusted well to their respective placements.  Visits were occurring via video chat due to Covid-19.

6

The court held a contested 12-month review hearing on August 4, 2020.  Mother requested return of the children, or in the alternative, overnight visits.  The court stated that she needed to continue in her services and demonstrate the ability to protect herself and the children.  However, it did give authority for unsupervised visits, overnights, and weekends with return by approval packet.  The court continued the parents' reunification services and set an 18-month hearing.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on November 16, 2020, recommending that the court terminate reunification services, but that the parents receive additional services under a planned permanent living arrangement (PPLA).  The social worker also recommended the children continue in foster care with a permanent plan of return home and requested that the children begin a 29-day trial extended visit in mother's home.  The social worker reported that mother had been having unsupervised visits, which increased in time to six hours.  Father continued to visit the children via Facetime.  The social worker agreed to supervise an in-person visit at the Victorville office, but father declined due to the long commute.  From August 2020 to November 2020, he did not make an effort to have any visits in person.

The court held an 18-month review hearing on November 25, 2020.  The court adopted CFS's recommendations and terminated the parents' reunification services.  However, it ordered an additional six months of services under the PPLA.  It also encouraged CFS to begin unsupervised visits with father as soon as possible.

7

*Section 366.3*

The social worker filed a section 366.3 post-permanent plan review report on May 25, 2021. CFS requested a 60-day continuance to allow time to investigate a recent referral alleging that father had a gun and drugs inside his glove box compartment. Mother obtained a restraining order against father until June 2021, and did not have contact with him.

The social worker further reported that mother had received a total of 24 months of services, and she continued to receive psychiatric services. Mother began a slow transition from one overnight visit to two per week. It was reported that once the children returned to the caregivers' home, they were hungry, defiant, and demanding. In January 2021, mother had three overnight visits, and A.F., Jr., returned to his foster home and wet himself. J.F. started throwing up. After a visit on January 26, 2021, it was reported that J.F. forced herself to vomit and threw up a small piece of plastic. Father transitioned to unsupervised visits, and the social worker stated there were no reported concerns.

The social worker also reported the permanent plan was to transition the children to mother's care under a plan of family maintenance since mother appeared to have benefitted from her services. However, the social worker reported that she interviewed J.F. on May 15, 2021, and while J.F. said visits with mother were good, she did not want to live with mother but wanted to live with her current caregiver, Ms. M.

On May 25, 2021, the social worker filed a CFS 6.7 memorandum and reported that CFS received a referral alleging a verbal altercation between mother and father.

8

Father reportedly chased mother and the children in his car and was then involved in a car accident. Furthermore, despite the active restraining order, they had been together with the children on several occasions. CFS temporarily suspended visits due to concerns about the parents' domestic violence history and continued communication. The social worker noted that the parents were not following visitation guidelines, court orders, or the restraining order, and it asked the court to temporarily suspend the parents' visits and grant a four-week extension to investigate the referrals.

The court held a review hearing on May 25, 2021, continued the matter to June 25, 2021, and ordered weekly supervised visits.

The social worker filed a CFS 6.7 memorandum on June 24, 2021, and reported that the recent allegations of general neglect, emotional abuse, and domestic violence, were either inconclusive or unfounded, although the parents did violate the restraining order. The social worker asked the court to terminate the parents' services since they had not benefitted from them and because they failed to follow court orders and violated the restraining order. The social worker also asked the court to reduce visitation to supervised visits once a month. Furthermore, the social worker recommended the court find the permanent plan of legal guardianship was appropriate.

At the June 25, 2021 hearing, the court reduced the parents' visits to supervised visits once a month. It stated the plan for the children was legal guardianship and adopted the social worker's recommendations, including that the parents' services under the PPLA be terminated.

*Section 388 and Section 366.3 Review*

On November 10, 2021, mother filed a section 388 petition requesting reinstatement of reunification services and increased visitation. The court set a hearing for December 21, 2021.

On November 20, 2021, the social worker filed a section 366.3 status review report and recommended that the court set a section 366.26 hearing to establish adoption with the children's current caregiver, Ms. M., as the permanent plan. The children appeared to be thriving in her care, except that she reported A.F., Jr.'s bad behavior tended to increase after his visits with mother. The children were bonded with Ms. M., and she agreed to adopt them. J.F. reported that she was happy in Ms. M.'s home and did not want to return to mother's home.

At a hearing on December 21, 2021, the court denied the section 388 petition[4] and set a section 366.26 hearing.

*Section 366.26*

The social worker filed a section 366.26 report on April 12, 2022, and recommended that parental rights be terminated and that the permanent plan of adoption be implemented. She reported that there had been no family contact this last reporting period.

---

[4] We note that mother filed a second section 388 petition, again asking for the reinstatement of her reunification services and increased visitation. The court denied the petition.

10

The court held a section 366.26 hearing on April 20, 2022. The parents were not present but were represented by counsel. The court noted the parents' counsel indicated they wanted to set the matter contested regarding the sibling bond exception and to get an update on visitation and J.F.'s opinion on adoption. Thus, the court set a contested hearing.

On May 3, 2022, the social worker filed a CFS 6.7 memorandum and reported that according to Ms. M., mother had not visited the children since October 2021, and father had not visited since May 2021. The social worker further noted J.F. informed her that she loved where she was living and wanted to live there forever. J.F. expressed her desire to be adopted by Ms. M. In a CFS 6.7 memorandum filed the following day, the social worker noted that the parents had stopped visiting, with mother's last known visit being in October 2021 and father's being in May 2021. They also stopped setting appointments and stopped returning phone calls from the agency. The social worker further noted there was no information on the bonding and attachment between mother and the children and commented that there did not appear to be a bond since she had not visited in the last six and one-half months.

Both parents appeared at the contested section 366.26 hearing on May 3, 2022. The court continued the hearing and ordered the parents to return to court on May 9, 2022.

At the hearing on May 9, 2022, father appeared but mother did not. Mother's counsel informed the court that he had communicated with mother, who said she was not present because of transportation issues. Counsel said mother lived about 30 minutes

11

away, and she was requesting a continuance so she could come in and testify. The court denied the continuance as not being in the best interests of the children. It stated that the information showed the parents had not visited in a significant period of time, so there was "nothing really to testify about." The court added that it attempted to call mother at the phone number counsel gave, so that she could at least be present by phone, but the number was out of service. The court reiterated that it was denying a continuance. Mother's counsel stated that mother indicated she had been visiting A.F., Jr., by video once a month, and she wanted the court to consider those visits.

The court then turned to father's counsel, who stated that father wished to testify. The court asked if there was any indication he had visited the children since May 2021 or October 2021. Father's counsel responded, "I don't believe that would be the testimony. However . . . I think [the] bond could be established without him having visited for the past year. But I don't believe his testimony will indicate that he has visited." The court replied, "Then I'm going to deny it because the first prong of the bond is consistent visits, and it's been a year. And the nine-year-old indicates she wants to live where she's living forever. . . . So there's nothing to testify about if there hasn't been visits in a year." The court proceeded to find the children adoptable, reiterated that the parents could not meet the first prong of the beneficial parental relationship exception, noted the children had been in a long-term placement, and found it in their best interests to pursue adoption and permanency. The court also found that any detriment was clearly outweighed by the benefits that adoption would provide them. The court then terminated parental rights.

12

## DISCUSSION

### I. The Juvenile Court Did Not Violate Father's Right to Due Process

Father contends the court abused its discretion in denying his request to testify at the section 366.26 hearing. He argues the court denied his due process right to present evidence, and the error was not harmless. We disagree.

#### A. *Relevant Law*

At a section 366.26 hearing, the juvenile court selects a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; § 366.26, subd. (b)(1)-(7).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) A permanent plan of adoption necessarily involves termination of the biological parents' parental rights to the child. (*Id.* at p. 574.)

In selecting a permanent plan for the child, the court is first required to determine whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If the court finds, based on clear and convincing evidence, that the child is likely to be adopted, and if there has been a previous court determination, by a preponderance of the evidence, that it would be detrimental to the child to return the child to his or her parent or guardian (§§ 366.21, 366.22), then the court is required to terminate parental rights and select adoption as the child's permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under at least one of several statutory exceptions to the adoption preference. (*Cynthia D. v. Superior Court* (1993)

13

5 Cal.4th 242, 249; § 366.26, subd. (c)(1)(B)(i)-(vi).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception applies where the court finds a "compelling reason" for determining that termination of parental rights would be detrimental to the child because, in the words of the statute, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"[A] parent has a right to 'due process' at the hearing under section 366.26 which results in the actual termination of parental rights." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816.) However, "[d]ue process is a flexible concept which depends upon the circumstances and a balancing of various factors." (*Id*. at p. 817.) "The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court." (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146-1147 (*Maricela C*.).) Therefore, "it does not violate due process for a trial court to require an offer of proof before conducting a contested hearing on one of the statutory exceptions to termination of parental rights." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122 (*Tamika T*.).)

14

B.  *Father Could Not Meet His Burden of Proof*

In *Tamika T.*, the mother attempted to defeat the termination of her parental rights with the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)  The trial court asked for an offer of proof on that issue and found her offer of proof insufficient to warrant a contested hearing.  (*Tamika T.*, *supra*, 97 Cal.App.4th at p. 1116.)  On appeal, the mother argued she had a statutory and constitutional right to a contested hearing and that the court erred in requiring her to first make an offer of proof. The appellate court concluded, "a trial court does not deny due process if it requires a parent to make an offer of proof before it conducts a contested hearing on the issue of whether a parent can discharge his or her burden of establishing a statutory exception to termination of parental rights." (*Ibid*.)

In the instant case, father's counsel informed the court that father wished to testify. The court essentially asked if father had any evidence that he had visited the children since May or October 2021.  Father's counsel responded, "I don't believe that would be the testimony.  However, . . . I think [the] bond could be established without him having visited for the past year.  But I don't believe his testimony will indicate that he has visited."  As the court noted, the first prong of the beneficial parental relationship exception is that the parents have "maintained regular visitation and contact with the child." (§ 366.26, subd. (c)(1)(B)(i); see *In re Caden C*. (2021) 11 Cal.5th 614, 631 (*Caden C*.) [the "three elements the parent must prove to establish the exception [are]: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to

15

the child"].) The evidence here showed that father had not visited the children since May 2021. Thus, as the court remarked, there was "nothing to testify about if there hasn't been visits in a year." We note that father was apparently not going to testify that he had visited, as his counsel told the court the "bond could be established without him having visited for the past year." Thus, the court properly denied father's request to testify since he could not satisfy the first prong of the exception. In other words, his due process right to present evidence was not violated since he did not have "relevant evidence of significant probative value" regarding the application of the beneficial parental relationship exception to the termination of parental rights. (See *Maricela C.*, *supra*, 66 Cal.App.4th at pp. 1146-1147; see *Tamika T.*, *supra*, 97 Cal.App.4th at p. 1122.)

Father contends the court erred in denying him the opportunity to testify and the error was not harmless. However, in support of this argument, he merely claims "the record *suggests* that the addition of [his] testimony *may* have made a difference in meeting his burden." (Italics added.) He then admits "the content of [his] testimony is unknown." These assertions do not establish that the court erred. Moreover, they tend to support a finding that any alleged error was harmless.

Father also asserts that the court set the matter for a contested hearing regarding the sibling exception to the termination of parental rights and claims his testimony was "an integral part of the evidence to establish the sibling bond." However, there was no mention of the sibling bond issue at the hearing on May 9, 2022. We further note his counsel told the court she did not believe father would testify that he had visited the children and stated, "However, … I think [the] bond could be established without him

16

having visited for the past year." In other words, counsel indicated that father wanted to testify in support of the beneficial parental relationship exception, not the sibling bond exception.

In light of the undisputed evidence that father did not visit the children for a year prior to the contested section 366.26 hearing, he simply could not satisfy the first prong of the beneficial parental relationship exception to the termination of parental rights. Moreover, his due process right to present evidence was not violated, since he did not have "relevant evidence of significant probative value" regarding the application of the beneficial parental relationship exception to the termination of parental rights. (See *Maricela C.*, *supra*, 66 Cal.App.4th at pp. 1146-1147; *Tamika T.*, *supra*, 97 Cal.App.4th at p. 1122.) Thus, the court properly denied his request to testify.

II. The Court Properly Denied Mother's Request for a Continuance

Mother's counsel informed the court that mother was not present at the contested section 366.26 hearing due to transportation problems, and he asked for a continuance because she wanted to testify. Mother now argues the court abused its discretion in denying a continuance of even one day to allow her to appear in court to resolve the discrepancy between the social worker's report that she had not visited in the past few months and her claim that she had been visiting A.F., Jr., by video.[5] We see no abuse of discretion.

---

[5] We note mother's claim that she had been visiting by video only involves one of the children.

A continuance shall be granted only on a showing of good cause and shall not be granted if it is contrary to the minor's best interests. (§ 352, subd. (a).) In considering a request for a continuance, the court must "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (*Ibid.*) "Continuances are discouraged [citation] and we reverse an order denying a continuance only on a showing of an abuse of discretion." (*In re Ninfa S*. (1998) 62 Cal.App.4th 808, 810-811.)

Mother's counsel's request did not offer the court good cause for the continuance.[6] The only reason offered was that mother wanted to come in and testify. The court stated that mother "[had] not visited in a significant period of time, so there's really nothing to testify about." The evidence showed that she had not visited the children since October 2021, which was seven months before the hearing. We also note the social worker's comment in the most recent CFS 6.7 memorandum that there did not appear to be a bond or attachment between mother and the children since she had not visited in the last several months. Thus, as in father's case, mother could not establish the first prong of the beneficial parental relationship exception—regular visitation. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 631.)

---

[6] We note that mother had ample time to arrange transportation for the hearing since she was present at the prior hearing on May 3, 2022, when the court ordered her to return on May 9, 2022. Moreover, the court attempted to contact her so that she could be present by phone at the May 9, 2022 hearing, but the number provided by her counsel was out of service. Further, there was no evidence as to when the transportation problems arose or what alternative efforts mother had made to attend the hearing.

18

As to mother's claim that her testimony "would have resolved [the] discrepancy in the visits during the final four months," the evidence showed that she had not visited the children for the previous *seven* months. Furthermore, there was no apparent evidence to support the other two prongs of the beneficial parental relationship exception. (See *Caden C.*, *supra*, 11 Cal.5th at p. 631.)

Like father, mother also asserts that the hearing on May 9, 2022, had been set for contest regarding the sibling exception to the termination of parental rights. She states there was no plan in place for sibling contact with the children's older half-sibling, D.F. However, as noted *ante*, there was no mention of the sibling exception at the hearing. We further note that the children had not lived with their half-sibling D.F. in approximately three years, and there was no evidence in the record of any sibling bond.[7]

Ultimately, the court properly found that it was in the children's best interest to pursue adoption and permanency. Because mother did not establish good cause for the continuance of the hearing and further delay would have interfered with the children's need for prompt resolution of their custody status and their right to a permanent placement, the court did not abuse its discretion by denying the continuance.[8]

---

[7] We observe the record actually reflects the lack of a sibling bond between D.R. and J.F., as it shows that during an interview, they had to be separated, as D.F. became upset with J.F. and pushed her into a wall and hit her.

[8] This is particularly true where the court sought unsuccessfully to reach mother at the contact telephone number she provided.

19

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS                         
                                 J.


We concur:


RAMIREZ               
               P. J.


MILLER               
               J.